**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| EUREKA DATABASE SOLUTIONS, LLC, | Case No. 8:18-cv-587-JMG-MDN |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT, JURY DEMAND, AND PLACE OF TRIAL DESIGNATION** |
| AGILE SPORTS TECHNOLOGIES, INC., d/b/a HUDL, | |
| Defendant. | |

Eureka Database Solutions, LLC, files this First Amended Complaint against Agile Sports Technologies, Inc., d/b/a Hudl, for infringement of U.S. Patent Nos. 6,311,189; 6,173,287 and 6,243,708.

**THE PARTIES**

1.      Eureka Database Solutions, LLC ("EDS") is a Texas limited liability company with its headquarters and principal place of business at 1400 Preston Road, Suite 475, Plano, Texas 75093.

2.      Defendant Agile Sports Technologies, Inc. d/b/a Hudl ("Defendant" or "Hudl") is a Delaware corporation with its principal place of business in Nebraska.  Hudl was served and has appeared.

**JURISDICTION AND VENUE**

3.      EDS brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b).  Hudl is

headquartered in this judicial district, does business in this judicial district, has provided downloads of and access to the Hudl Assist, Gamebreaker Plus, and Sportscode Pro and Elite products to users in this judicial district, committed acts of infringement in this judicial district, and has purposely transacted business in this judicial district involving the accused products.

### THE EUREKA PATENTS

5.    Hudl has infringed and continues to infringe U.S. Patent Nos. 6,311,189 (the "'189 Patent"); 6,173,287 (the "'287 Patent"), and 6,243,708 (the "'708 Patent") (collectively "the Asserted Patents" or the "Patents-in-Suit").

6.    The '189, '287 and '708 Patents relate to methods, apparatuses, and systems for ranking multimedia annotations of interest, matching a query to a portion of media, and accessing an item of interest within a stored representation of data.

7.    EDS is the assignee of all right, title, and interest in and to the '287 Patent, titled "Technique for ranking multimedia annotations of interest" (attached as Exhibit A), the '189 Patent, titled "Technique for matching a query to a portion of media" (attached as Exhibit B), and the '708 Patent, titled "Technique for accessing an item of interest within a stored representation of data" (attached as Exhibit C). EDS has the exclusive right to assert all causes of action arising under the Patents-in-Suit and the right to remedies for infringement thereof.

8.    The original assignee of the '189 Patent, Altavista Company, was one of the most popular search engines in the late 1990s. It was created by research scientists at Digital Equipment Corporation (the original assignee of the '708 and '287 Patents) and was the 11th most visited website in 1998. Yahoo purchased Altavist in 2003.

**The Asserted Patents**

9.      On January 9, 2001, the United States Patent and Trademark Office issued the '287 Patent for inventions covering, in one claimed embodiment, a method for accessing an item of interest within a particular one of a plurality of stored representations of data, the method comprising: a) searching a plurality of stored annotations corresponding to different items within the plurality of stored representations of data to locate an annotation of interest corresponding to the item of interest, the annotation of interest having an associated data identifier and an associated location identifier, the associated data identifier corresponding to  the particular one of the plurality of stored representations of data, the associated location identifier corresponding to a location of interest within the particular one of the plurality of stored representations of data; b) searching a plurality of stored data identifiers associated with the plurality of stored annotations to locate the associated data identifier and an associated address identifier, the associated address identifier corresponding to an address of the particular one of the plurality of stored representations of data within the plurality of stored representations of data; and c) accessing the item of interest at the location of interest using the associated address identifier and the associated location identifier.

10.      The technologies recited in the claims of the '287 Patent provide inventive concepts and do not claim an abstract idea.  The inventive concepts are directed to a technical solution to solve a problem unique to data storage technology, by greatly enhancing and facilitating the operation of data storage technology.

11.      For example, embodiments of the claimed invention recite a method for accessing an item of interest within stored representations of data by using annotations, data identifiers, locations of interest and other computer-specific technology.  The inventions are directed to

3

helping organizations solve the problem of allowing multimedia content to be easily stored on, and retrieved from, relatively inexpensive digital storage devices.  '287 Patent, col. 1, lines 16-17.

12.    The technology claimed in the '287 Patent presented new and unique advantages over the state of the art at the time.  Although the inventions taught in the claims of the '287 Patent have by today been widely adopted by leading businesses, at the time of the invention, the technologies were innovative.  At that time, organizations had little or no means of searching *within* multimedia content, organizing information *about* multimedia content, and delivering multimedia content in a ubiquitous manner.  *See* '287 Patent, col. 1, lines 11-64.

13.    In the Background of the Invention section of the specification, the inventors described the state of the art: large amounts of analog multimedia data that was being digitized to enable more efficient and cost-effective storage and retrieval.  Digital content provides the ability to store, search, browse, and retrieve multimedia content that may exist in distributed datastores.

14.    A problem the inventors recognized and solved by their inventions was that multimedia content owners had little or no means of searching the content, organizing information about multimedia content, and delivering multimedia content.  More specifically, there was little or no "means for searching inside streams of multimedia content (e.g., audio/video streams), adding meta-information to multimedia content (i.e., annotating multimedia content) for purposes of indexing within multimedia content, and providing universal access to indexed multimedia content over a variety of connection speeds and on a variety of client platforms."

15.    The growing volume of digitized multimedia content at the time of the inventions gave rise to a need for an efficient system and technique for augmenting digital content with metadata associated with portions of content that could be stored in association with the content, searched to locate portions of content of interest, and enable efficient retrieval and delivery of

relevant portions without the need for retrieving and delivering entire content streams that would then be searched for the particular portion of interest.

16.    The asserted claims of the '287 Patent are not directed to a method of organizing human activity, a fundamental economic practice long prevalent in our system of commerce, or a building block of the modern economy.  Instead, they are limited to specific solutions for data storage technology.

17.    The technology claimed in the '287 Patent does not preempt all ways for accessing items within a stored representation of data.  For example, the claims do not preclude identifying the location of a stored document or other methods of searching for data that do not use all of the claimed steps and elements.

18.    The '287 Patent claims cannot be practiced by a human alone and there exists no human analogue to the methods claimed in the '287 Patent.  The claims are specifically directed to data storage, annotation, retrieval, and indexing technology and recite components such as annotations, data identifiers, locations of interest and other computer-specific technology that exist in the context of computer-based systems and cannot be practiced by a human alone.

19.    The particular combination of claim elements recited in the claims of the '287 Patent was not well-understood, routine, or conventional to a skilled artisan in the relevant field at the time of the inventions.

20.    The claimed subject matter of the '287 Patent describes novel techniques and methods for transforming digital multimedia content by storing annotations associated with the digital content, searching the stored annotations to locate a desired portion of the digital content, and providing access to specific portions of the stored multimedia digital content without the need for burdensome and time-consuming review of large multimedia streams to find particular portions

of interest.

21.    The specifications of the Asserted Patents describe data elements for use in practicing the inventions that one of skill in the art at the time of the inventions (circa 1998) would recognize as not being generic.

22.    An "Object Table" is a data element in a meta database that lists all multimedia objects.    An Object Table comprises, in an exemplary embodiment, an assigned object identification number, which typically is a unique numeric or alphanumeric value, and object type (e.g., audio or video).

23.    Figure 8 exemplifies the structure and content of an Object Table:



FIG. 8

24.    A "Representation Table" stores representations, each assigned a unique identification number, corresponding to objects.

25.    Figure 9 exemplifies the structure and content of a Representation Table:



FIG. 9

26. An "Annotation Table" lists annotations in the object database. Examples of annotations include transcript, speaker, or keyframe. Annotations generated for an object that represents an audio/video stream, for example, have a corresponding start and end time.

27. Figure 10 exemplifies the structure and content of an Annotation Table:

FIG. 10

28.     The novel metadata structures and elements claimed in the '287 Patent were not generic database components well known to or understood by those of ordinary skill in the art at the time of the inventions.

29.     The novel techniques for performing operations on the metadata structures and operations claimed in the '287 Patent were not generic database components well known to or understood by those of ordinary skill in the art at the time of the inventions.

30.     The claimed subject matter of the '287 Patent describes systems and methods for transforming multimedia content into searchable, retrievable, and efficiently stored (enabling distributed storage and access) datastores associated in a novel manner to enable operations that could not be performed on analog or digital multimedia content at the time of the inventions.

31.     On October 30, 2001, the United States Patent and Trademark Office issued the '189 Patent. One claimed embodiment recites a method for matching a query to a portion of media,

comprising: a) receiving a query relating to media of interest; b) searching, based upon the query, a plurality of annotation values to identify an annotation value within the plurality of annotation values which matches the query, each of the plurality of annotation values corresponding to a respective portion of a respective item of available media; c) identifying a start time of a media stream forming a first portion of a first item of available media corresponding to the identified annotation value; and d) providing the identified media stream start time in response to the query.

32.     The '189 Patent focuses on the structure, function, and operation of the Annotation Table and claims systems and methods for using it to query, identify, and provide access to multimedia content.

33.     The Annotation Table (see Figure 10) stores metadata associated with multimedia content.

34.     An Annotation Table was not a generic component in multimedia storage and streaming systems at the time of the inventions circa 1998, and generating and using an Annotation Table was not a well-understood methodology for performing operations on stored multimedia content.

35.     The claimed subject matter of the '189 Patent provided an inventive augmentation to stored digital multimedia content by providing a searchable Annotation Table used to locate start times or other indicia of portions of multimedia content of interest.

36.     The technologies recited in the claims of the '189 Patent provide inventive concepts and do not claim an abstract idea.  The inventive concepts are directed to a technical solution to solve a problem unique to media streaming technology, by greatly enhancing and facilitating the searching, identifying portions of, and providing access to digital multimedia data streams.

37.     For example, embodiments of the claimed invention recite a method for matching

9

a query to a portion of media using queries and other computer-specific technology. The inventions are directed to helping organizations solve the problem of allowing multimedia content to be easily stored on and retrieved from relatively inexpensive digital storage devices. *See* '189 Patent, col. 1, lines 13-21.

38.    The '189 Patent provides a technique for matching a query to a slice of media.

39.    The technology claimed in the '189 Patent presented new and unique advantages over the state of the art at the time. Although the inventions taught in the claims of the '189 Patent have by today been widely adopted by leading businesses, at the time of the invention, the technologies were innovative. At that time, organizations had little or no means of searching *within* multimedia content, organizing information *about* multimedia content, and delivering multimedia content in a ubiquitous manner. *See* '189 Patent, col. 1, lines 13-66.

40.    The claims of the '189 Patent are not directed to a method of organizing human activity, a fundamental economic practice long prevalent in our system of commerce, or a building block of the modern economy. Instead, they are limited to specific solutions for data media streaming technology.

41.    The '189 Patent describes and claims methods and systems utilizing a non-abstract Annotation Table data structure having specific data elements necessary for providing the ability to perform pinpoint search, retrieval, and provision functions on stored digital multimedia content.

42.    The technology claimed in the '189 Patent does not preempt all ways for matching queries to media. For example, the claims do not preclude matching the query to the media as a whole, or other methods of searching for data that do not use all of the claimed steps and elements.

43.    The '189 Patent claims cannot be practiced by a human alone and there exists no human analogue to the methods claimed in the '189 Patent. The claims are specifically directed

to matching a query to a portion of media using queries and other computer-specific technology that exists in the context of computer-based systems and cannot be practiced by a human alone.

44.    The particular combination of claim elements recited in the claims of the '189 Patent (including in particular annotation values in an Annotation Table) was not well-understood, routine, or conventional to a skilled artisan in the relevant field at the time of the inventions.

45.    On June 5, 2001, the United States Patent and Trademark Office issued the '708 Patent for inventions covering, in one claimed embodiment, a method for locating a particularly relevant position within a multimedia stream comprising the steps of; a) identifying a multimedia stream based upon a query; b) identifying locations relevant to the query within the multimedia stream; c) ranking the relevance of each of the identified locations; and d) determining a particularly relevant one of the identified locations within the multimedia stream based upon the ranking.

46.    The claimed subject matter of the '708 Patent relates to querying annotated and indexed digital multimedia content to generate relevance rank and weight associated with the results of the query representing locations of particular portions of multimedia content.

47.    The specification ('708 at 21:4-10) describes how such operation provides specific benefits to users:

> In audio/video retrieval, it is a requirement that users be able to start an audio/video stream from the most relevant position within the audio/visual stream. Thus, an indexing system must not only determine that an audio/video stream is relevant, but also all relevant locations within the audio/video stream, and preferably rank the relevance of those locations.

48.    The technologies recited in the claims of the '708 Patent provide inventive concepts

and do not claim an abstract idea. The inventive concepts are directed to a technical solution to solve a problem unique to multimedia stream technology (identifying portions of digital multimedia content located by weighted or ranked query results), by greatly enhancing and facilitating the operation of querying and retrieval functions in multimedia stream technology.

49.    Utilizing the disclosed Object, Representation, and Annotation Tables to perform query operations on multimedia content to provide ranked and weighted query results identifying specific locations (e.g., start times) in the digital content was neither known nor well understood at the time of the inventions circa 1998.

50.    For example, embodiments of the claimed invention recite a method for locating a particularly relevant position within a multimedia stream by using queries, rankings, and other computer-specific technology. The inventions are directed to helping organizations solve the problem of allowing multimedia content to be easily stored on and retrieved from relatively inexpensive digital storage devices. *See* '708 Patent, col. 1, lines 14-22.

51.    The technology claimed in the '708 Patent presented new and unique advantages over the state of the art at the time. Although the inventions taught in the claims of the '708 Patent have by today been widely adopted by leading businesses, at the time of the invention, the technologies were innovative. At that time, organizations had little or no means of searching *within* multimedia content, organizing information *about* multimedia content, and delivering multimedia content in a ubiquitous manner. *See* '708 Patent, col. 1, lines 14-67.

52.    The claims of the '708 Patent are not directed to a method of organizing human activity, a fundamental economic practice long prevalent in our system of commerce, or a building block of the modern economy. Instead, they are limited to specific solutions for data storage technology.

53.    The technology claimed in the '708 Patent does not preempt all ways for accessing items

within a stored representation of data. For example, the claims do not preclude identifying the location of a stored stream or other methods of searching for data that do not use all of the claimed steps and elements.

54.     The '708 Patent claims cannot be practiced by a human alone and there exists no human analogue to the methods claimed in the '708 Patent. The claims are specifically directed to locating a particularly relevant position within a multimedia stream by using queries, rankings, and other computer-specific technology that exists in the context of computer-based systems and cannot be practiced by a human alone.

55.     The particular combination of claim elements recited in the claims of the '708 Patent was not well-understood, routine, or conventional to a skilled artisan in the relevant field at the time of the inventions.

**HUDL**

56.     The Hudl ecosystem enables users to upload multimedia content, and subsequently tag, code, search, filter, and sort the content seamlessly across mobile phones, tablets, and computers regardless of each device's operating system.



57.     Hudl users download and install the Hudl software and may install a copy of the software on each of their devices.

58.     Hudl offers many branded versions of its products for sale and download, including Hudl, Hudl Classic, Hudl Assist, Hudl Sportscode, Hudl Gamebreaker, Hudl Sportscode Pro, and

Hudl Sportscode Elite.

59.    In 2015 Hudl acquired Sportstec whose products include Sportscode.

60.    Hudl acquired Sportstec's Sportscode line of products.

61.    Upon information and belief, all Sportstec products are now sold under the Hudl brand name.

62.    Hudl promotes its "Sportscode powered by Hudl" product on its website.



63.    Hudl software is available at www.hudl.com (via web browser) and from app stores operated by Apple and Google.

64.    The Hudl software is available for various hardware including Apple devices (e.g., iPods, iPhones, and iPads), Android-based devices (e.g., cell phones, tablets, and computers), and Mac and Windows-based personal computers.

65.    According to Defendant, Hudl software is currently available for the following systems:

14



66.    According to Hudl, iPhones and iPads are supported devices.

67.    According to Hudl, Android smartphones are supported devices.

68.    According to Hudl, Windows-based PCS are supported devices.

69.    According to Hudl, Mac computers are supported devices.

70.    Hudl promotes the features of its products (including Hudl Assist, Gamebreaker+, Sportscode Pro and Sportscode Elite) on its website at www.hudl.com.

71.    Hudl provides accurate information on its website www.hudl.com.

72.    Hudl provides instructions to users of the Hudl products on its website.

73.    Hudl provides detailed how to, tutorials, and other instructions on its website under "Hudl support."



74.    Hudl provides detailed videos on their website describing the functionality of its products.

75.    Hudl provides accurate information about its Sportscode products in its manual available at: https://static.hudl.com/craft/SportsCodeManual-2.pdf.

76.    Hudl provides accurate information about its products in its videos posted on its website.

77.    Hudl provides accurate information about its products in its support video at: https://www.hudl.com/support/v3/watch-and-manage-video/overview/find-your-video.

78.    Hudl provides accurate information about its products in its manual at: https://static.hudl.com/craft/GamebreakerManual-copy.pdf.

79.    Hudl promotes the ability to analyze video and track stats on its "easy-to-use online platform."



80.    Hudl Sportscode includes features to code and review performance live.



81.    The Hudl Sportscode products include Sportscode Gamebreaker+, Sportscode Pro, and Sportscode Elite.







82.    The Hudl mobile app includes functionality to allow users to upload video content to the Hudl platform.



83.    Hudl advertises on its website that its Sportscode products (all versions) include functionality to create a custom code window and define the length of each coded instance.

## Capture Data

| Capture Data | SPORTSCODE GB+ | SPORTSCODE PRO | SPORTSCODE ELITE |
|---|:---:|:---:|:---:|
| **Create a custom code window** <br> Build personalized code windows to capture and measure the KPIs important to your team. All code button text, colors, size and alignment can be designed to meet your needs. | ▪ | ▪ | ▪ |
| **Play back captured video with ease** <br> Quickly filter down to key moments you want to review. | ▪ | ▪ | ▪ |
| **Define the length of each coded instance** <br> Add lead and lag time to a button to control how much time before and after an event you want to include. | ▪ | ▪ | ▪ |
| **Flag key moments** <br> Quickly categorize specific moments for easy recall when reviewing. Add notes for more context and choose to send them directly to your reporting tools. | | ▪ | ▪ |
| **Code more information** <br> Increase the amount of information you're coding live or post-game by adding meta descriptions with labels. | | ▪ | ▪ |
| **Advanced control of your code buttons** <br> Change button opacity and/or color. | | ▪ | ▪ |
| **Execute calculations while coding** <br> With scripting commands, you can compute data from what you've coded. | | ▪ | ▪ |
| **Utilize multiple analysts** <br> Divide coding responsibilities among multiple Sportscode devices over a LAN or the internet connection. | | | ▪ |

84.    Hudl's Sportscode (the Sportscode Pro and Sportscode Elite versions) include functionality to add descriptions with labels to the uploaded videos.

85.    Hudl's Sportscode Elite product includes functionality to code wirelessly with Coda.

86.    Hudl's Sportscode Elite includes functionality to send instances to Sportscode live from an iOS device using iCoda.

87.    Hudl promotes the use of its video coding and retrieval products as being able to "quickly jump to the moments you need to see."



88.    Hudl software integrates with Sportscode data and allows for uploading content onto the Hudl platform.





Available at: https://vimeo.com/264553510

89.    Hudl software includes functionality to sort by the codes and tags applied to the video to create playlists.



90.    Video tags/codes can be sorted on the Hudl platform by player and other metrics.

21



91.    Sportcode data can be uploaded to the Hudl platform.  When the Hudl platform export feature is selected and the file is downloaded, the Hudl online platform automatically launches to allow the user to upload the data to the Hudl platform.





92.    Hudl Assist is a service provided by Hudl.

93.    Hudl Assist makes use of the Hudl platform and functionality.

94.    For Hudl Assist a user submits a video (usually of a game) to the Hudl "professional analysts" to tag team stats and code the video, and then the annotated video is posted on the Hudl platform for review.





## How It Works



**Submit your game.**

Send us any game or opponent video with the click of a button.



**We break it down.**

Our team of professional analysts tag team stats for both sides of the ball.



**It's ready in 24 hours.**

You'll get an email as soon as the video and its reports are ready.

95.    The Hudl App has a button which allows for upload to Hudl Assist.



96.    Hudl Classic includes functionality to match tagged data to relevant video content.

97.    Hudl Classic allows users to tag stats live during an event (e.g. game).

98.     Once a user has tagged a game and uploaded the video, the tagged data can be matched to the relevant video content.



99.     Hudl instructs its users how to match the tagged data to the video content.

100.    Hudl instructs the users to upload the video and then check the box next to Live Tag Data or Imported Data



101.   Hudl instructs users to click "match."



102.   Hudl instructs users to use the up and down arrows to move the data to match it with the corresponding video clip.



103.   Hudl Classic includes functionality to use the online editing tools which allow a video clip to be split, deleted, or merged with another clip.



104.   Hudl Classic includes functionality to save the tags which are aligned with the appropriate portions of the video.





105.    Hudl filtering allows users to select values to include in the filtered list.

④ Select the value(s) that need to be included in the filtered list.



⑥ Click the **X** in the top-right corner to apply the filter.

106.  Hudl includes features for filtering clips In List, Equal to, Not equal to, Greater than/equal to, Less than/equal to, and Between.

⑧ In the second box, the condition box, select a filter type to apply to your clips by choosing one from the drop-down. The filter types in Hudl include:

- **In List:** Generates a list of available filter values to choose from in the Value drop-down. This is the easiest filter type to use. Only the selected values will appear in the clips list. For instance, if you want to filter to all offensive plays in the ODK column, click the O option.

- **Equal to:** The Value input becomes a text box. Only clips with a data value that equals the value you type will appear in the clips list. For instance, if you want to filter to all offensive plays in the ODK column, you would type O in the Value box.

- **Not equal to:** The Value input becomes a text box. Only clips with a data value that is not equal to the value you type will appear in the clips list. For instance, if you want to filter out all offensive plays in the ODK column (leaving just defensive and kick plays), you would type O in the Value box.

- **Greater than/equal to:** The Value input becomes a text box. Only clips with a data value that is greater than or equal to the value you type will appear in the clips list. For instance, if you want to filter to see all plays with a distance greater than or equal to 10 yards, you would type 10 in the Value box.

- **Less than/equal to:** The Value input becomes a text box. Only clips with a data value that is less than or equal to the value you type will appear in the clips list. For instance, if you want to filter to see all plays with a distance less than or equal to 5 yards, you would type 5 in the Value box.

- **Between:** The Value input becomes two text boxes. Only clips with a data value that is between the two values you type will appear in the clips list. For instance, if you want to filter to see all plays with a distance between 3 and 6 yards, you would type 3 and 6 in the Value boxes.

107.   The Hudl platform allows for sorting numerically, alphabetically, reverse order, and by frequency.



108.   In the sorter window, instances (e.g., tackle, goal, etc.) can be automatically sorted by movie time references, alpha-numerically, or frequency of occurrence according to grouped labels.

*Part 4 - SportsCode Review/Analysis*



## Sorter Window *



The sorter window is a spreadsheet-style organizing and analysis tool, a powerful combination of the movie organizer, instance sequencer and statistical window. In the sorter window, instances can be trimmed, labels can be edited, and instance notes added. Rows can be automatically sorted by movie time references, alpha-numerically, or frequency of occurrence according to grouped labels. And final presentations can be arranged with picture rows created from the drawing window.



Like the movie organizer, rows are created in the sorter window by pasting instances from a timeline. Select instances in a timeline and press the sorter button in the timeline tool bar. A new sorter window will open automatically if one is not open. If a sorter window is open, the instances will be pasted below the last row in the window.

An individual row can be moved vertically up or down to change the order by clicking and dragging from the row number. Multiple rows can be selected by holding down COMMAND or SHIFT, then moved as a group by clicking and dragging with these keys pressed down.

During the analysis process, a higher level of detail can be added in the sorter window. Any changes made to an instance in the sorter window can be synchronized with the original timeline.

From: https://static.hudl.com/craft/SportsCodeManual-2.pdf (page 155)

109.    Hudl's products include features to rank the relevance of each identified location on the multimedia (e.g. movies/clips).

110.    Hudl's products use codes and labels to create instances in movies.

111.    Hudl's products include a timeline feature that allows for searching of multimedia (e.g. movies/clips) via a find window.

112.    Hudl's products include functionality to access an item of interest (e.g. instances for a coded event in a sports game, or any other custom created label for an instance) within a Hudl

timeline, instance, database, and Code Matrix associated with a movie or clip uploaded by a user or uploaded by Hudl through its Assist product.



From https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 28)



From https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 43)



From https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 45)

113.    As shown below by the components of a Hudl timeline, the movie will play from the location of the playhead in the timeline.  Hudl represents the playhead with a small triangle pointing in a downward direction.



From https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 48)

114.   The boxes in the timeline rows (as shown above) display "instances" and where they happen within the movie.   The Hudl products include tools for editing and presenting instances.

② Click an instance to select it.



③ Click **Edit**.



💡 You can also use the keyboard shortcut **Control** + **E** to begin editing.

115.    The Hudl products include functionality to change the start and end point of an instance.

④ To change the start point of the instance, use the left set of small arrows. Click the left arrow to make the instance start sooner, and the right arrow to make it start later. A single-click will edit the instance by a single frame. To quickly extend or trim by multiple frames, click and hold the arrow.



To change the starting point by a large amount of time, move the red playhead to the desired starting point and press **Control + I**

116.    The length (start and end) of an instance can be edited.

# Edit the Length of an Instance in the Timeline

Quickly adjust the start or end time of an instance directly in the timeline rather than using the **Instance Edit** window.

1. Hold **Option + Command** on the keyboard and hover over the edge of the instance you'd like to change. Your cursor should change to the appearance of the one seen in the image below.



2. Click and drag the instance to the desired position. The video in the timeline movie window will advance according to your cursor position.

117.    The instances can also be edited or nudged (changing the start and end time slightly) the same length of time.



118.    Once the instances are labeled/coded they can be searched.

119.    A start and end time in the video can be set for searching instances.

1. Locate the dynamic code matrix.



② Click and drag the begin and end markers to denote your desired time frame.



120.    As shown above, the time markers are configured as 0:10-29.5 and 0:25-55.9.

121.    The Hudl and Sportscode platforms search a plurality of stored annotations (i.e. metadata related to coded instances, labels and text) corresponding to stored timelines, instances, databases, and Code Matrixes to locate instances, labels, and/or text corresponding to the desired instance, label, or text.

122.    The Hudl products include the capability to search for metadata in the Hudl and Sportscode files to provide greater ease of accessing the multimedia content.

## The Find Window

The Find Window provides the capacity to search for metadata in any open window, a folder on the hard drive containing SportsCode files or across a network to a shared location. When used effectively the Find Window will save countless amounts of time particularly in transcription and statistical scripting plus improve the analysis process when creating video based reports across extensive longitudinal data.

Find can be accessed by clicking on the Find button in the timeline toolbar or choosing Edit > Find in the main menu bar.

From https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 127)

123.  The Hudl platform's "Find Window" search mode allows the user after a successful search to make a movie from found instances.



## Quick Label Searches

The most basic type of search is the Quick label search, just type in the label to be searched for and hit RETURN on the keyboard. This quick label search is conducted on all open timelines. The results of this search are displayed as a number in the yellow button to the right of the text that you have just typed in. Clicking on the yellow button will make a movie of the found instances. This is the quickest way of searching for a particular label.



From https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 127)

40



https://www.hudl.com/support/v3/watch-and-manage-video/overview/find-your-video

124. The instance or label corresponding to the search term has an associated data identifier (e.g. an object ID for a movie timeline, database, or Code Matrix) and an associated location identifier (e.g. an ID/code corresponding to a position within a movie timeline, database or Code Matrix).



https://static.hudl.com/craft/SportsCodeManual-2.pdf (pages 17-18)



125.    The Hudl platforms search a plurality of data identifiers (e.g. database object IDs) associated with the plurality of stored instances and labels to locate a data identifier and an address (e.g. a URL or file storage location) corresponding to a particular movie and/or movie timeline.



126.    A particular instance and/or label is accessed at a position in a movie timeline using the address and timestamp (or other code indicating a position in the movie timeline).

**Making Movies From Found Instances**



Make Movie

After a successful search, the results can be made into movies by selecting the Make Movie icon  or by double clicking in the search results list that is displayed.

> ▼ Liverpool vs PSV (Timeline)
>     Carragher J # 43, 50/50 challenge, Wins Corner
>     Reise JA # 7, Overlap, Control, Run with Ball, Turn, Feint, Cross, Wins Corner, Zone ▸…
>     Bellamy C # 8, Cross, Wins Corner
>     Garcia L # 17, Corner
>     Garcia L # 49, Corner
>     Gonzalez M # 24, Control, Run with Ball, Cross, Wins Corner
>     Pennant J # 7, Corner, Zone ▸ Front 1/3 L

**Databasing Found Instances**

Searches results can be databased by selecting the instances in the results and clicking on the database icon found in the toolbar.

https://static.hudl.com/craft/GamebreakerManual-copy.pdf (page 100)

127. Once accessed via a search, instances can be made into movies and databases.

128. Instances associated with a movie timeline can be accessed by filtering the timeline's associated instances when viewing a movie online at hudl.com.



129.    The Hudl products match a query to a portion of media.



130.    Hudl, via the Hudl platform, instructs users how to search for (query) a particular instance or label among movie timelines (e.g. media of interest).



131.    The Hudl products identify a start time for each search result and provides those start times.



https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 154)





https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 161)

https://static.hudl.com/craft/SportsCodeManual-2.pdf (at page 155)

132.    Hudl realizes substantial value from video indexing on the Hudl application and platform.

133.    Hudl infringes the EDS Asserted Patents by making, using, monetizing, selling, providing, promoting, deploying, and testing the Hudl ecosystem including Hudl infrastructure (e.g., server-based systems), the various Hudl apps that users install on phones, tablets, and computers including Hudl, Hudl Classic, Hudl Assist, Gamebreaker Plus, and Sportscode Pro and Elite products.  These infringing Hudl components and Hudl systems are the "Hudl Products."

## COUNT 1 - INFRINGEMENT OF U.S. PATENT NO. 6,311,189

134.    EDS realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth verbatim in this Count.

135.    EDS is the owner, by assignment, of U.S. Patent No. 6,311,189, titled "Technique for Matching a Query to a Portion of Media."

136.    As the owner of the '189 Patent, EDS holds all substantial rights in and under the '189 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

137.   The United States Patent Office granted the '189 Patent on October 30, 2001.

138.   The '189 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code and a full examination by the Patent Office.

139.   Defendant has been and is practicing one or more claims of the '189 Patent, including at least claims 1, 2, 4, 9-12, and 18-20 by making, using, monetizing, testing, offering for sale, selling, and/or importing the Hudl Products that provide indexing, annotations, coding, and the ability to search and display media.

140.   Hudl has directly infringed, and continues to infringe, the '189 Patent by deploying, testing, using, providing, monetizing, and operating the Hudl Products.

141.   Hudl directly infringes the '189 Patent by making, using, selling, offering for sale, and/or importing the Hudl Products which include the multimedia (e.g. video) marking, tagging, labeling, indexing, searching and displaying functionality.

142.   The Hudl Products use a method for matching a query to a portion of media.

143.   The Hudl Products receive a query (search) relating to media of interest (e.g. video). For example, the Hudl Products allow users to search for a particular instance, keyword, label, or text.

144.   Hudl is on notice that the Hudl Products are especially made or especially adapted for use in infringing the '189 Patent and how these products infringe the asserted claims of the '189 Patent.

145.   Defendant's infringing conduct described in this Count has damaged EDS.  Hudl is liable to EDS in an amount that adequately compensates it for infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 2 - INFRINGEMENT OF U.S. PATENT NO. 6,173,287

146.    EDS realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth in this Count.

147.    EDS is the owner, by assignment, of U.S. Patent No. 6,173,287, titled "Technique for Ranking Multimedia Annotations of Interest."

148.    As the owner of the '287 Patent, EDS holds all substantial rights in and under the '287 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

149.    The United States Patent Office granted the '287 Patent on January 9, 2001.

150.    The '287 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a complete examination by the Patent Office.

151.    Hudl has been and is practicing one or more claims of the '287 Patent, including at least claims 1-4, 6, 7, and 10 by making, using, offering for sale, monetizing, selling, and/or importing the Hudl Products that provide functionality including indexing, annotating, labeling, tagging, coding, and the ability to search (query) and display media.

152.    Hudl has directly infringed, and continues to infringe, the '287 Patent by deploying, testing, using, monetizing, and operating the Hudl Products.

153.    Hudl directly infringes the '287 Patent by making, selling, offering for sale, and importing the Hudl Products.

154.    The Hudl Products use a method for accessing an item of interest (*e.g.*, a keyword) within a particular one of a plurality of stored representations of data (*e.g.*, a video).

155.    The Hudl Products search a plurality of stored annotations corresponding to different items within the plurality of stored representations of data to locate an annotation of

interest corresponding to the item of interest.  For example, the Hudl Products identify an annotation of interest (*e.g.*, a particular instance) from among the videos.  A particular keyword has an associated data identifier (*e.g.*, the textual representation) and an associated location identifier (*e.g.*, a timestamp).

156.    The Hudl Products search a plurality of stored data identifiers associated with the plurality of stored annotations to locate the associated data identifier and an associated address identifier, the associated address identifier corresponding to an address of the particular one of the plurality of stored representations of data within the plurality of stored representations of data.  For example, the Hudl Products identify a particular instance, keyword, or label from a multitude of possible instances, keywords, or labels and locates an associated data identifier (e.g., the textual representation) and an associated address identifier.

157.    Hudl instructs and encourages end users of the Hudl Products to use the Hudl indexing and annotation functionality.

158.    Hudl is on notice of the Asserted Patents and the conduct by Hudl and its end users and customers that infringes them.

159.    Hudl is on notice that the Hudl Products are especially made or especially adapted for use in infringing the '287 Patent and how these applications infringe the asserted claims of the '287 Patent.

160.    Hudl has detailed knowledge about its specific conduct that EDS contends infringes the '287 Patent.

161.    As a result of Hudl's infringing conduct described in this Count, EDS has been damaged.  Defendant is liable to EDS in an amount that adequately compensates it for Defendant's infringement, which, by law, can be no less than a reasonable royalty, together with interest and

costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 3 - INFRINGEMENT OF U.S. PATENT NO. 6,243,708

162.    EDS realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth in this Count.

163.    EDS is the owner, by assignment, of U.S. Patent No. 6,243,708, titled "Technique for Accessing an Item of Interest Within a Stored Representation of Data."

164.    As the owner of the '708 Patent, EDS holds all substantial rights in and under the '708 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

165.    The United States Patent Office granted the '708 Patent on June 5, 2001.

166.    The '708 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full examination by the Patent Office.

167.    Hudl has been and is practicing one or more claims of the '708 Patent, including at least claims 1, 2, 3, and 11 by making, testing, importing, deploying, using, selling, and/or monetizing the Hudl Products that provide functionality including indexing, annotating, labeling, tagging, coding, and the ability to search media.

168.    Hudl has directly infringed, and continues to infringe, the '708 Patent by deploying, testing, importing, selling, monetizing, using, and/or operating the Hudl Products.

169.    Hudl encourages its users and customers to use the indexing and annotation features of the Hudl Products.

170.    Hudl is on notice of EDS's '708 Patent and the conduct by Hudl and its end users that EDS alleges infringes the asserted claims of the '708 Patent.

171.    Hudl is on notice that the Hudl Products are especially made or especially adapted

for use in infringing the '708 Patent and how these products infringe the asserted claims of the '708 Patent.

172.    EDS has been damaged as a result of Hudl's infringing conduct.  Hudl is liable to EDS in an amount that adequately compensates it for Defendant's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## NOTICE AND WILLFULNESS

173.    EDS does not currently distribute, sell, offer for sale, or make products embodying the asserted EDS Patents.

174.    Hudl has actual notice of the Asserted Patents and EDS's contention of infringement.

175.    EDS provided notice to Hudl of its infringement of the EDS patents (including 6,311,189 and 6,183,287) in June of 2018.  EDS provided detailed allegations regarding Hudl's infringement.

176.    EDS provided further notice to Hudl in August and October of 2018.

177.    Since Hudl's receipt of notice, its infringement of the Asserted Patents has been and continues to be willful.

178.    With knowledge and reason to know of facts that would lead a reasonable person to realize their actions were risky, Defendant continue to commit, direct and undertake the acts EDS contends infringe the Asserted Patents.

179.    Hudl has known since notice in June of 2018 the specific conduct that EDS contends infringe the Asserted Patents.

180.    Since receiving notice, Hudl has made no effort to avoid infringing the Asserted Patents.

181.    Since receiving notice, Hudl has continued to promote the products that EDS alleges infringe the Asserted Patents and instruct end users and customers how to use the Hudl accused products to infringe the Asserted Patents.

182.    Defendant has detailed knowledge about the specific features and functionality in its products that EDS has identified as infringing the asserted claims of the Asserted Patents, and Defendant has had such knowledge since receipt of the notice in June of 2018.

183.    Since receiving notice, Hudl has made no effort to change, or remove products or components that infringe the Asserted Patents.

184.    Since receiving notice, Hudl has made no effort to instruct end users or customers how to avoid infringing the Asserted Patents.

185.    Since receiving notice, Hudl has promoted and sold products that infringe the Asserted Patents.

186.    Enhanced damages under 35 U.S.C. § 285 are appropriate in this case in light of Hudl's willful infringement.

**NOTICE OF REQUIREMENT OF LITIGATION HOLD**

187.    Defendant is hereby notified it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Defendant knows, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy

51

form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

188.    As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of Defendant's agents, resellers, or employees if Defendant's electronically stored information resides there.

189.    Defendant is hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Defendant's claims and/or defenses.  To avoid such a result, Defendant's preservation duties include, but are not limited to, the requirement that Defendant immediately notify its agents and employees to halt and/or supervise the auto-delete functions of Defendant's electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic

deletion.

## JURY DEMAND AND PLACE OF TRIAL DESIGNATION

190.  EDS hereby demands a trial by jury on all claims, issues and damages so triable and requests that such trial occur at Omaha, Nebraska.

## PRAYER FOR RELIEF

191.  EDS prays for the following relief:

a.  That Defendant be summoned to appear and answer;

b.  That the Court enter an order declaring that Defendant has infringed the Asserted Patents;

c.  That the Court grant EDS judgment against Defendant for all actual, consequential, special, punitive, increased, and/or statutory damages, including, if necessary, an accounting of all damages; pre and post-judgment interest as allowed by law; and reasonable attorney's fees, costs, and expenses incurred in this action;

d.  That Defendant's infringement has been willful and award enhanced damages under 35 U.S.C. § 285; and

e.  That EDS be granted such other and further relief as the Court may deem just and proper under the circumstances.

DATED this 15th day of March, 2019.

**Eureka Database Solutions, LLC, Plaintiff**

Cabrach J. Connor (*pro hac vice pending*)
cab@connorkudlaclee.com
Jennifer Tatum Lee (*pro hac vice pending*)
jennifer@connorkudlaclee.com
CONNOR KUDLAC LEE PLLC
609 Castle Ridge Road, Suite 450
Austin, Texas 78746
512.777.1254 Telephone
888.387.1134 Facsimile

and

By: s/Justin D. Eichmann
   Justin D. Eichmann - #22405
   Keith A. Harvat - #21008
   **HOUGHTON BRADFORD WHITTED PC LLO**
   6457 Frances Street, Suite 1800
   Omaha, Nebraska 68106
   (402) 344-4000 | (402) 930-1099 Fax
   jeichmann@houghtonbradford.com
   kharvat@houghtonbradford.com

   **ATTORNEYS FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

   The undersigned hereby certifies that on March 15, 2019, I electronically filed the foregoing Entry with the Clerk of Court using the CM/ECF system which sent notification of such filing to those registered.

00484355

     s/Justin D. Eichmann